RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0395p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BILLY EXUM,

*Petitioner,*

*v.*

No. 07-2070

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

---

On Petition for Review of an Order
of the National Labor Relations Board.
No. 26-CA-20287.

Argued: July 30, 2008

Decided and Filed: November 7, 2008

Before: GIBBONS and McKEAGUE, Circuit Judges; ADAMS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Bryce W. Ashby, DONATI LAW FIRM, Memphis, Tennessee, for Petitioner. Gregory P. Lauro, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Bryce W. Ashby, William B. Ryan, DONATI LAW FIRM, Memphis, Tennessee, for Petitioner. Gregory P. Lauro, Julie B. Broido, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

---

## OPINION

---

ADAMS, District Judge. Petitioner Billy Exum ("Petitioner") appeals the National Labor Relations Board's ("Board") decision reversing the decision of the Administrative Law Judge ("ALJ") and dismissing Petitioner's complaint. Petitioner had brought a complaint against his employer, Fineberg Packing Company, Inc. ("Employer"), alleging that it had discharged Petitioner and thirty-one other striking employees in violation of Section 8(a)(1) of the National Labor Relations Act (29 U.S.C. § 158(a)(1)) ("Act"). The ALJ found that Employer had condoned the strike in which the employees had engaged and that it therefore wrongly discharged the employees. Employer appealed the ALJ's decision to the Board, which held that the facts did not support a

---

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

finding of condonation and that Employer had not acted in violation of the Act. Petitioner now appeals the Board's decision and challenges its finding on the issue of condonation.

## I.　　Factual and Procedural History

Employer is a corporation in Memphis, Tennessee, that is in the business of slaughtering and butchering livestock and processing the meat after slaughter. Employer admitted and the ALJ found that Employer was one "engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act and that the United Food and Commercial Workers, Local No. 515 AFL-CIO (Union) is a labor organization within the meaning of Section 2(5) of the Act."

The United Food and Commercial Workers Union has represented Employer's production and maintenance employees for over forty years. The Collective Bargaining Agreement ("CBA") provided that the employees were guaranteed a thirty-five hour workweek. The CBA further provided that "there shall be no strikes, lockouts, slowdowns or legal proceedings without first using all possible means of settlement as provided in this Agreement of any controversy which might arise."

In 2001, Employer encountered increased costs of production and began to entertain the idea of cutting the employees' workweek back to ten to fifteen hours per week. Richard Freudenberg ("Freudenberg"), a Plant Manager at Employer's facility and an employee for over forty years, met with Union Representative John Canada ("Canada") in January 2001 and presented Employer's plan of a temporary three-month suspension of the thirty-five hour workweek in favor of a ten- to fifteen-hour workweek. The only alternative to this proposal was a layoff, which was impracticable for Employer who required at least twenty-one workers per species of livestock[1] in order to complete the slaughtering process, and a layoff would cause Employer to be unable to maintain that number of employees. Canada agreed to the proposal of the reduced workweek and agreed that the reduction in hours would begin February 15, 2001. Freudenberg testified that he had an "open-door policy" and that any employee who was dissatisfied was free to talk to him at any time, but that no employees came to him to discuss this workweek reduction, nor did anyone file a grievance as required by the CBA.

Petitioner testified before the ALJ that the employees became dissatisfied upon hearing rumors of the reduced workweek plan but were unsuccessful in their attempts to contact their Union Representative. Petitioner said that some employees believed they should have been laid off rather than have their work hours reduced.

## A.　　February 14, 2001

On February 14, 2001, the day before the reduced workweek was to go into effect, some of the employees began to discuss the possibility of talking with Freudenberg about the situation. A large number of employees left their work stations and proceeded to the front of the plant. According to Petitioner, the employees wanted to talk to Freudenberg about why this change was being made without Employer's first having sought the consent of the employees.

David Green, a safety and sanitation inspector for Employer, contacted Freudenberg on his cell phone to tell him that the employees had said that they were on strike and "had walked out and they refused to go back to work until they had talked with [Freudenberg]." He had heard Petitioner walk onto the "kill floor," where several animals had already been slaughtered that morning, and yell to his fellow employees "[L]et's go." According to Green, "[E]veryone walked out. As everyone was walking out, anybody that was left exited the building also." Green reported this to

---

[1]During the period immediately prior to the strike, Employer was slaughtering both hogs and cattle.

Freudenberg, who arrived at the plant between 7:30 a.m. and 7:45 a.m., twenty to twenty-five minutes after Green's call.

The employees gathered in front of the plant and insisted upon speaking to Freudenberg as a group. According to Petitioner, some of the employees were shouting to Freudenberg. He told them that they needed to return to work and that he could only speak with them individually, not as a group. Petitioner came to Freudenberg's truck where Freudenberg told him to get the employees back to work, but Petitioner refused and insisted that they simply wanted to talk to him. The parties are, for the most part, in agreement on the facts to this point.

The factual disputes arise regarding what happened next. Freudenberg testified that Petitioner told him the employees were on strike because of the new workweek, and showed him a piece of paper with names on it, which he said was intended to be an employee vote to make Petitioner the new shop steward. Freudenberg knew that he could not negotiate with Petitioner, who was not recognized by the Union, and he had no intention of explaining to the assembled employees what agreement had been reached with the Union, which he considered to be the Union's responsibility.

Rather than discuss the issue with them, Freudenberg told the employees they had fifteen minutes to return to work or they would need to leave the property. If they chose not to return to work and to leave the premises, Employer would consider them as having voluntarily quit and abandoned their jobs. According to Freudenberg, some employees asked if they were being fired, and he told them that they were not but reiterated that they needed to return to their work stations or leave the premises. He went so far as to say that he had pleaded with them to return to work because there was a certain amount of time within which the slaughtered livestock had to be processed before the meat was rendered unfit for human consumption. Freudenberg said that some employees did return to work at that point, but others did not. Among the latter was a twenty-year employee named Melvin Guy whom Freudenberg said he warned about losing his job if he left. Freudenberg expressly denied that he had told anyone–either individually or as part of a group–to return to the plant the next day.

According to Petitioner and the other striking employees, Freudenberg said that they were not being fired, but that they should put up their things in their lockers and return the next day. Petitioner testified that he went into the dressing room to remove his work clothes and put them in his locker, and on his way out he dropped his pen. When he stopped to pick it up, he said that Freudenberg told him to take it with him because he might need it to fill out job applications. Petitioner said he questioned Freudenberg about whether he was being fired, and Freudenberg responded that he was not and that he should return the next day. Freudenberg concurs that he made a comment about Petitioner's taking the pen with him to fill out job applications but says he never told Petitioner he was to return the next day.

The employees that testified they were told to return the next day said they believed Freudenberg meant they should return the next day to resume work. However, none of them stated that they believed they were simply being given the rest of the day off, nor could they explain why they would have received a day off.

Ultimately, Freudenberg ordered the employees who did not return to work to exit the premises, which they did by congregating just off the premises to await the arrival of Canada, the Union Representative. They said that, as they left the premises, the gates were closed behind them. Freudenberg insisted that the gates were closed but were not locked because Employer never locked the gates while the plant was operational, partly because customers and suppliers would need access to the premises. While the employees waited for Canada, Kathy Furlong, a one-year employee of Employer, called the news station and the mayor's office to inform them of the strike, though she

also testified that she thought she would be returning to the plant the next day. Canada eventually arrived and drove up to the plant to speak with Freudenberg, passing the employees without saying anything more than hello out the window of his vehicle. After he had met with Freudenberg for approximately half an hour, he left the premises, stopping briefly to tell the striking employees that they should attend a Union meeting the next day at 3:00 p.m. According to Canada, none of the striking employees told him that they believed they would be returning to work the next day.

B.     February 15, 2001

       Freudenberg testified that he left David Green in charge of the gate the morning after the strike. Green confirmed this testimony. Green said that he arrived for work at 4:00 a.m. on the morning of February 15, 2001, and that he used his magnetic keycard to gain access to the premises because the gates were locked, which was always the case between 2:00 a.m. and 5:30 a.m. Both men testified that Freudenberg had told Green to watch for vandalism of the property and to call Freudenberg if he saw anything of the sort. According to Green, he had no instructions to deny anyone access to the premises before the gates were officially opened. Freudenberg testified that he had no knowledge of any employees who arrived for work and either could not or did not enter the property.

       The striking employees gave unclear testimony about the events of the morning after the strike. Most said that they arrived for work that morning to find that the gates were "locked." Others said that they were certain they could not get through the gates, either because Green had told them he was not permitted to let them through or because the gate did not open for them when they pulled up. However, none of the employees exited their vehicles to look at the gate or to talk to Green.[2] Some said that they saw those manning the gates opening them for and closing them behind those employees who had returned to their work stations the day before. Kathy Furlong testified that she did not attempt to go to the gate on foot because it was raining, but she "knew" Employer would not let her enter. None of these employees attempted to contact Freudenberg by phone to ask why they had been denied access on February 15 when he had supposedly told them on February 14 to return to work the next day.

       It appears that a meeting was held at the Union hall on February 15, 2001, in the afternoon. There was no testimony about what happened at that meeting.

C.     Succeeding days

       The striking employees returned to the plant to pick up their paychecks on February 16, 2001. Freudenberg told them to clean out their lockers and return to Employer all equipment that belonged to it. The employees who returned to pick up their paychecks did not talk to Freudenberg about their allegation that they had not been permitted to return to work on February 15, nor did they question him about the separation notices they received that indicated that they had voluntarily quit and abandoned their jobs. The Union has never been asked by any of the employees to file a grievance on their behalf.

       Petitioner filed his Complaint with the Board on June 29, 2001. A trial was conducted by an ALJ from June 17-19, 2002, after which the ALJ found in favor of Petitioner, holding that Employer had condoned the strike and had therefore improperly discharged the striking employees, who were engaged in protected concerted activities. The matter was transferred to the Board on October 4, 2002. Upon appeal by Employer, a three-member panel of the Board reviewed and

---

[2]Petitioner testified, in contrast with all of the other striking employees, that no one was manning the gate. Katie Brooks gave somewhat elusive testimony about how she did try to "do the lock," but it was entirely unclear what she meant by that.

rejected the ALJ's ruling in a 2-1 decision. The Board relied upon the record before the ALJ, holding that Petitioner had not attempted to argue that the activities of the striking workers were protected, thereby implicitly conceding the point, and had further failed to demonstrate that Employer had condoned those activities. Petitioner timely filed an appeal to this court.

## II.     Jurisdiction

Under 29 U.S.C. § 160(f), this court has jurisdiction of a party's petition for review of a final Board decision. Section 10(e) of the Act provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Respondent had originally challenged this court's jurisdiction, but has since withdrawn that challenge. The court finds that it does have jurisdiction of this appeal.

## III.    Standard of Review

We review the Board's findings of fact to determine if those findings are supported by "substantial evidence" in the record, considered as a whole. *Allied Mechanical Servs., Inc. v. NLRB*, 113 F.3d 623, 626 (6th Cir. 1997) (citing 29 U.S.C. § 160(e)); *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995). "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). This court has held that

> [e]vidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision. Although this Court should consider the evidence contrary to the Board's conclusions, it may not conduct a *de novo* review of the record. When there is a conflict in the testimony, it is the Board's function to resolve questions of fact and credibility, and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor. The Board's application of the law to particular facts is also reviewed under the substantial evidence standard. However, if the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has no reasonable basis in law.

*Vencare Ancillary Servs., Inc., v. NLRB*, 352 F.3d 318, 321-22 (6th Cir. 2003) (internal citations omitted). "The Board's choice between two equally plausible and reasonable inferences from the facts cannot be overturned on appellate review, even though a contrary decision may have been reached through de novo review of the case." *N.L.R.B. v. Davis & Burton Contractors, Inc.*, 725 F.2d 684, 1983 U.S. App. LEXIS 12243, at *4 (6th Cir. Dec. 19, 1983) (unpublished table decision) (citing *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968)).

In an instance in which the Board disagrees with the ALJ, the United States Supreme Court has said that it is "not require[d] that the [ALJ's] findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and [the ALJ] disagree." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951).

## IV.     Analysis

The Fifth Circuit has held that "[w]here . . . strike misconduct is clearly shown, condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred." *NLRB v. Marshall Car Wheel & Foundry Co.*, 218 F.2d 409, 414 (5th Cir. 1955). This court adopted the Fifth Circuit's test for condonation in

*Plasti-Line, Inc., v. N.L.R.B.*, 278 F.2d 482, 486-87 (6th Cir. 1960). It is clear from the case law that there must be a showing of misconduct on the part of the striking employees in order for the doctrine of condonation to apply.

Petitioner has asked this court to hold only that the Board erred in finding that Employer had not condoned the employees' strike. However, the Board rendered a decision as to two issues, as follows:

> [W]e find that the General Counsel established neither that the employee work stoppage constituted protected activity, nor that the Respondent condoned the employee work stoppage. The doctrine of condonation rests upon the preliminary finding that the activities of the employees were unprotected, and the court finds that Petitioner has conceded the point. The court would briefly note that the employees were operating under a CBA that they violated when they began a strike without attempting to discuss the situation with Employer who, according to the testimony of both Freudenberg and the striking employees, had no notice that the employees were dissatisfied or intended to strike. Therefore, with no argument from Petitioner, the court affirms the Board's finding that the strike was unprotected and proceeds to the issue of condonation.

As this Circuit has held in adopting the Fifth Circuit's reasoning regarding the doctrine of condonation, both elements of condonation, namely "forgiveness and the resumption of the former relationship between the strikers and [the employer]," must be shown by means of unequivocal, positive actions by the employer. *Plasti-Line*, 278 F.2d at 487; *Marshall Car Wheel*, 218 F.2d at 414. The case law in this circuit makes it clear that the employer's action expressing forgiveness cannot be vague or equivocal.

After he received a paycheck that was not honored by his bank, the petitioner in *Davis & Burton* set up a one-man picket line in front of his employer's facility, which was a violation of the union's CBA with the employer. *Davis & Burton*, 1983 U.S. App. LEXIS 12243 at *2. The employer addressed the petitioner's concerns and continued to employ him for several weeks, at which time the petitioner and all of the other employees on his job site were laid off because the term of employment had come to an end. *Id.* at *2-*3. Later, when more work was available, all but two of those employees were recalled. *Id.* at *3. Petitioner learned that he was not recalled because he was known as a troublemaker based upon the picketing incident, and he filed a complaint with the Board. *Id.* Both the ALJ and the Board found that the employer had condoned the petitioner's actions by continuing to employ him and had then wrongfully refused to re-hire him.

Upon appeal by the employer, the Sixth Circuit stated the standard of review and concluded that there was not substantial evidence in the record to support a finding of condonation. *Id* at *4-6. It held that only one element of condonation had been satisfied, namely the resumption of the employment relationship, but that, in continuing the petitioner's employment, the employer was simply waiting until the end of the petitioner's contract to discharge him. *Id.* at *5-6. The court held that the employer's silence in retaining the petitioner until the term was completed did not constitute an unequivocal act of forgiveness, and its delay in taking disciplinary action against the petitioner did not indicate a desire to continue his employment indefinitely. *Id.* at *6-8.

The court similarly found that the employer had not condoned the employees' unprotected activities in *Plasti-Line*. In contravention of their CBA, the petitioners in *Plasti-Line* left their work stations and clocked out at the start of their "wildcat strike." *Plasti-Line*, 278 F.2d at 484-85. The foreman told them they must return to work immediately if they did not wish to be terminated. *Id.* at 485. At that point, some returned to the plant to talk with other employees, but they did not clock back in or report to their supervisors. *Id.* The employees were terminated that afternoon by means

of letters issued to them by the employer.  *Id.*  When some of the terminated employees returned to the plant for work on the next working day, the foreman told them they would have to leave, which they did.  *Id.*  None of the employees protested further, but they proceeded to file a complaint before the Board.  *Id.*

The Board found that the employer in *Plasti-Line* had condoned the employees' strike, but this court reversed that ruling for lack of any unequivocal action on the employer's part that would have demonstrated forgiveness:

> We recognize the power of the Board to draw reasonable inferences from evidential facts but a thorough study of the record fails to reveal substantial evidence of any kind or degree to support a finding that petitioners condoned the actions of the strikers herein. There is no evidence whatever of a positive act by the petitioners to indicate either a forgiveness of the strikers or an intention to resume their former relationship with them.

*Id.* at 487.  The court concluded that the Board must have "misapprehended and grossly misapplied" the substantial evidence standard.  *Id.*

In the instant case, the ALJ first discredited the testimony of Freudenberg because he was sarcastic and argumentative in his testimony and then found credible the employees' testimony that Freudenberg had told them to return to work the next day.  With minimal analysis, the ALJ found that such a comment indicated a forgiveness of the employees' strike and an intention to continue the employment relationship. The ALJ particularly noted testimony from Robert Alston, one of the striking employees, who said that he believed Freudenberg when he said they should come back the next day.  Alston said he never would have left because he had been there thirty-five years and had undergone a hip replacement, which would make it difficult for him to find new employment.

In reviewing the ALJ's decision, the Board first noted that there were two separate work stoppages in this case.  The first was when the employees en masse walked away from their jobs and stood outside the plant.  The second was when the employees were given an opportunity to return to work with no repercussions.  While neither was a protected strike, the first was clearly forgiven by Employer if the employees returned to their stations, and all employees who did so remained employed.  Petitioner and the other employees who continued the strike and chose not to return to their stations initiated a second work stoppage that was not condoned, and for which they were terminated.

The Board noted its precedent that an employee who claims that an employer condoned his activities must present clear and convincing evidence of that condonation in order to succeed in his claims. 349 NLRB 29, 2007 NLRB LEXIS 35, at 3-4 (January 31, 2007) (quoting *United Parcel Serv.*, 301 NLRB 1142, 1143 (1991)).  The Board found that Petitioner had failed to support his claim of condonation with clear and convincing evidence.  Instead, it found that if it were assumed that Freudenberg told the employees to return the next day,  such a statement was ambiguous at best.

However, the Board recited in reverse order the facts surrounding Petitioner's dropping of his pen, a fact upon which Petitioner focuses in his brief to this court.  Petitioner had testified before the ALJ that when he dropped his pen, Freudenberg told him he should keep hold of the pen because he would need it to fill out job applications.  Petitioner said he then directly asked Freudenberg whether he was fired, and Freudenberg said he was not, and he should return the next day.  The Board stated that Petitioner's question and Freudenberg's assurance that he was not fired came before Petitioner's dropping the pen and Freudenberg's cautioning him to keep it for job applications.

If Petitioner's ordering of events is assumed, Freudenberg may have negated the implication that Petitioner was terminated by subsequently assuring Petitioner that he was not being fired. However, when the attempt to explain several otherwise inexplicable inconsistencies requires this type of parsing, which still does not explain why the employer and the striking employees continued to behave as if the employees had been terminated, we must conclude that Petitioner has not met his burden of demonstrating by clear and convincing evidence that Employer condoned the strike.

There is substantial evidence in the record to support the Board's finding that Employer did not condone the employees' strike. The employees' behavior does not support a claim of condonation. Not only did the employees not tell Canada on the day of the strike that they intended to return to work the next day, but they also did not discuss with Freudenberg the determination on their separation notices that they had voluntarily quit and abandoned their jobs. Furthermore, if Freudenberg told the employees to return to work the next day, such a comment when taken in the context of his other statements was entirely ambiguous. Because the employer's actions in forgiving an unprotected strike must be unequivocal, and a petitioner must demonstrate by clear and convincing evidence that such forgiveness occurred, the court finds that Petitioner has failed to satisfy his burden.

## V.　　Conclusion

There is substantial evidence in the record to support the Board's determination. Petitioner failed to demonstrate that Employer condoned the unprotected activity of the striking employees and wrongfully terminated those employees in violation of § 8(a)(1) of the Act. The court affirms the Board's decision.