RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

               *Petitioner* (15-2305),

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, LOCAL 1700,

     *Petitioner/Cross-Respondent* (15-2305/2478),

        *v.*

NATIONAL LABOR RELATIONS BOARD,

     *Respondent/Cross-Petitioner* (15-2305/2478).

> Nos. 15-2305/2478

───────────────

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 07-CA-081195; 07-CB-082391.

Argued: September 28, 2016

Decided and Filed: December 21, 2016

Before: GILMAN, GIBBONS, and STRANCH; Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** John R. Canzano, MCKNIGHT, CANZANO, SMITH, RADTKE & BRAULT, P.C., Royal Oak, Michigan, for Petitioner/Cross-Respondent UAW Local 1700. Jared D. Cantor, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** John R. Canzano, MCKNIGHT, CANZANO, SMITH, RADTKE & BRAULT, P.C., Royal Oak, Michigan, for Petitioner/Cross-Respondent UAW Local 1700. Jared D. Cantor, Usha Dheenan, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

    GIBBONS, J., delivered the opinion of the court in which GILMAN and STRANCH, JJ., joined. STRANCH, J. (pg. 19), delivered a separate concurring opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.    United Automobile, Aerospace and Agricultural Implement Workers of America, Local 1700 (Local 1700) was charged with violating its duty of fair representation in processing the grievance of Aretha Powell, a Local 1700 member, who was terminated from her position as an automotive plant janitor after threatening a fellow employee.   The charge stemmed from the allegations that Margaret Faircloth, Powell's union steward, had submitted a false statement against Powell and was subsequently involved in Powell's grievance process.   After an Administrative Law Judge dismissed the charge, the National Labor Relations Board (the Board) reversed, finding that Local 1700 had violated its duty of fair representation to Powell by acting arbitrarily or in bad faith.   The Board emphasized that it was relying on three facts, taken together, to support its finding: (1) Faircloth had submitted a statement against Powell that was partly false; (2) Faircloth had represented Powell in the first stage of the grievance process without disclosing the fact that she had submitted a statement; and (3) Powell was unaware of Faircloth's statement throughout the grievance process.   Because we conclude that the Board's finding regarding the falsity of Faircloth's statement is not supported by substantial evidence, and that there is an insufficient basis to find that Local 1700 breached its duty of fair representation, we grant the petition for review, deny the cross-application for enforcement, and vacate the portion of the Board's decision addressing the breach of the duty of fair representation.

I.

A.

Caravan Knight Facilities Management, LLC (Caravan Knight) performs janitorial services for Chrysler Automotive at its Sterling Heights Assembly Plant (the Plant). International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the International Union), through its Local 1700 affiliate (Local 1700, collectively, the Union) represents Caravan Knight janitors who work at the Plant.   Caravan Knight and the

Union were parties to a collective bargaining agreement (CBA) that ran from December 1, 2009 to November 30, 2012.

Aretha Powell, the charging party, was hired by Caravan Knight as a janitor on September 2, 2008. At the same time, she joined the bargaining unit represented by Local 1700. Powell's employment at Caravan Knight was not without incident. In early May 2012,[1] Powell told a group of employees that she wanted to fight Faircloth and then offered to pay one hundred dollars to anyone else who would also fight Faircloth. Powell later apologized to Faircloth when she found out that Faircloth had learned of her statements. On May 10, Powell was issued a disciplinary warning for walking away from a mandatory pre-shift meeting and not being able to answer questions about what was discussed. Later in the day on May 10, Powell got into a fight at the Plant with Dishan Longmire, her ex-boyfriend and a fellow Caravan Knight employee. The fight was likely related to Longmire's involvement with a third employee, Balinda Tanner.

The next day, prior to the start of her shift, Powell threatened Tanner while they were in the cage area. Powell told Tanner, "I see I'mma have to tear into your motherfucking ass."[2] Tanner Hr'g Tr., JA 938. Tanner immediately reported the comments to Faircloth and LeVaughn Davis, Local 1700's union chairperson for the Plant. Tanner and Faircloth then submitted statements to Shaun Walle, Caravan Knight's site manager, indicating they were present when the threat occurred.[3] Faircloth later testified that she reported the May 10 incident with Tanner because she believed Powell's behavior was escalating. Walle proceeded to investigate the allegations by interviewing several employees, among them, Nathaniel Hudson, a janitor working on the day of the incident. On May 12, Powell met with Walle, Faircloth, and Davis to submit her statement about the incident with Tanner. During that meeting, Walle suspended Powell pending an investigation. Caravan Knight terminated Powell four days later on May 16.

---

[1]All subsequent dates refer to 2012 unless otherwise indicated.

[2]The ALJ credited Tanner's testimony over Powell's with respect to this incident.

[3]The ALJ found Faircloth was not in the room at the time, relying on the "credible testimony" of Nathaniel Hudson, a fellow Caravan Knight employee. JA 966. The Board also found that Faircloth did not witness Powell's statement to Tanner.

As an elected union steward for Local 1700, Faircloth's duties included processing grievances for terminated employees. Under the CBA, grievances were processed in a series of steps. First, the employee or a representative submitted a written grievance to her immediate supervisor that was signed by a union committee person (Step 1). If the grievance was not resolved at Step 1, Caravan Knight and Local 1700 representatives would meet to attempt to resolve the dispute (Step 2). If the grievance could not be resolved in this meeting, representatives from Caravan Knight, the International Union, and Local 1700 would meet to attempt to resolve the grievance (Step 3). If this was unsuccessful, either party could take the matter to binding arbitration (Step 4).

On May 18, Faircloth submitted a grievance on Powell's behalf to satisfy Step 1. She met with Walle to submit the grievance but did not offer any arguments on Powell's behalf.[4] Caravan Knight denied the grievance at Step 1. Local 1700 then proceeded to Step 2 of the grievance procedure, with Davis now representing the Union and Powell. Davis and Caravan Knight negotiated a settlement that would allow Powell to return to work without back pay. In exchange, Powell would be required to complete an anger-management course, drop all pending claims before the Board, and sign a ninety-day last-chance agreement. These terms were consistent with a recent settlement agreement in a grievance based on similar facts. Davis testified that a settlement was proposed within 48 hours of the grievance moving to Step 2.

Davis informed Powell of the proposed settlement on May 23. Powell rejected it.[5] The Union and Caravan Knight, nevertheless settled the grievance under the agreed-upon terms. Powell received a letter confirming the disposition of her grievance on July 26.

Between May 16 and August 14, Powell filed a series of charges against Caravan Knight, the International Union, and Local 1700, alleging violations of Sections 8(a)(1), (a)(3), (b)(1)(A), and (b)(2) of the National Labor Relations Act (NLRA). After charges were filed, Caravan Knight interviewed employees, asking about their interactions with Board investigators. Powell

---

[4]Both the ALJ and the Board found that Faircloth's actions constituted "representing Powell at Step 1" of the grievance process. JA 967, 1155.

[5]The ALJ found that Powell would have rejected the settlement regardless of its terms. The Board found that she may have taken a different course.

testified that she did not learn of Faircloth's statement about the May 11 incident until the Board informed her of it in early June.

B.

On August 21, the Board's Regional Director consolidated Powell's charges and issued a single complaint against all three parties. This consolidated complaint alleged that Caravan Knight violated Sections 8(a)(1) and (a)(3) of the National Labor Relations Act (NLRA) by imposing onerous working conditions on Powell, changing her job duties, disciplining her, suspending her, and discharging her because she engaged in protected activity. The complaint also alleged that Caravan Knight violated Section 8(a)(1) of the NLRA by coercively interrogating employees about their communications with a Board investigator. The complaint alleged that the Union's refusal to proceed to arbitration on Powell's grievance was arbitrary, discriminatory, or bad-faith conduct constituting a breach of the union's duty of fair representation to Powell, in violation of Section 8(b)(1)(A) of the NLRA. The complaint further alleged that Local 1700 caused Caravan Knight to discriminate against and discharge Powell because of her protected activity, in violation of Section 8(b)(2).

An Administrative Law Judge (ALJ) held a hearing on these allegations. On April 3, 2013, the ALJ issued a Decision and Order dismissing the complaint in its entirety. With respect to Caravan Knight, the ALJ found an insufficient causal connection between Powell's protected activity and the disciplinary action. The ALJ also found that a totality of the circumstances established that Caravan Knight's subsequent interviews with employees were not unlawfully coercive. The ALJ dismissed all charges against the International Union because the legal distinction between the International Union and Local 1700 precluded any derivative duties on the International Union and there was no indication that International Union officials were involved in Powell's grievance process.

In considering the claims against Local 1700, the ALJ found it undisputed that there was a strained relationship between Powell and the three local union officials—Davis, Faircloth, and Tanner—all of whom were involved in her grievance process. The ALJ, however, recognized that these Local 1700 officials still filed a grievance on Powell's behalf and negotiated a

settlement for Powell's reinstatement consistent with a recent settlement for another employee in a similar situation. The ALJ found that the Board's Acting General Counsel failed to show that Tanner and Faircloth acted as union agents when submitting witness statements against Powell. For these reasons, the ALJ concluded that there was no arbitrary or bad faith conduct on the part of Local 1700, and thus no violation of its duty of fair representation under Section 8(b)(1)(A). As to the Section 8(b)(2) charge that Local 1700 caused Caravan Knight to discharge Powell, the ALJ found no evidence that Tanner and Faircloth did anything other than perform their required duties as Caravan Knight employees by submitting the statements that led to Powell's discipline and termination.

The Board's Acting General Counsel filed thirteen exceptions to the ALJ's decision on May 31, 2013.[6] Caravan Knight filed two cross-exceptions on June 14, 2013. A three-member panel of the Board issued a Decision and Order on August 27, 2015, affirming in part and reversing in part the ALJ's decision. The Board adopted all of the ALJ's witness-credibility determinations, finding no "clear preponderance" of evidence on which to reverse such findings. JA 1151 n.2. The Board reversed the ALJ on two issues. First, it found that Caravan Knight violated Section 8(a)(1) by coercively interrogating an employee about her statements to a Board agent.[7] Second, the Board found Local 1700 liable under Section 8(b)(1)(A) for violating its duty of fair representation to Powell. Although the Board determined that Local 1700 acted within its discretion to refuse to pursue Powell's grievance past Step 2, it held that Local 1700 breached its duty of fair representation to Powell on the basis of three facts "consider[ed] cumulatively" that established bad faith or arbitrary conduct:

> (i) Union Steward Faircloth submitted a statement against Powell that was, in part, false; (ii) Faircloth represented Powell in step 1 of the grievance procedure without disclosing that she had submitted a statement against Powell; and (iii) throughout the processing of her discharge grievance, Powell remained unaware that Faircloth had submitted a statement regarding the matters at issue in Powell's grievance.

---

[6]The Acting General Counsel did not take exception to the dismissal of the International Union, so it was never considered by the Board and is not at issue in this appeal.

[7]Caravan Knight has not challenged the Board's decision.

JA 1151, 1155.  The Board reasoned that Powell might have pursued a different course of action had she known of Faircloth's statement.  The Board was careful to note that this case presented "unique circumstances" because of the "absence of any disclosure to Powell" and that its liability finding was "narrowly circumscribe[d]."  JA 1156.

The Union petitioned this court for review of the Board's decision and order as to a single issue: whether Local 1700 was liable under Section 8(b)(1)(A) for breaching its duty of fair representation.  The Board filed a cross-application for enforcement of its decision and order against Local 1700.

II.

We review the Board's factual determinations and its applications of law to fact under the substantial-evidence standard.  *NLRB v. Galicks, Inc.*, 671 F.3d 602, 607 (6th Cir. 2012).  We uphold the Board's decisions if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Int'l Union, United Auto., Aerospace & Agric. Workers of Am. v. NLRB*, 514 F.3d 574, 581 (6th Cir. 2008) (internal citations omitted).  The Board's determinations of law are reviewed *de novo*.  *Id.* at 580.

In reviewing the Board's fact-finding, we "respect the judgment of the agency empowered to apply the law to 'varying fact patterns.'"  *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996) (quoting *Bayside Enters., Inc. v. NLRB*, 429 U.S. 298, 304 (1977)).  We "defer to the Board's reasonable inferences and credibility determinations, 'even if we would conclude differently under *de novo* review.'"  *Galicks*, 671 F.3d at 607 (quoting *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002)).  "The Board's choice between two equally plausible and reasonable inferences from the facts cannot be overturned on appellate review, even though a contrary decision may have been reached through de novo review of the case."  *Exum v. NLRB*, 546 F.3d 719, 724 (6th Cir. 2008).

The Board is "free to find facts and draw inferences different from those of the ALJ."  *Jolliff v. NLRB*, 513 F.3d 600, 607 (6th Cir. 2008).  But it cannot "ignore relevant evidence that detracts from its findings."  *GGNSC Springfield LLC v. NLRB*, 721 F.3d 403, 407 (6th Cir. 2013).  The ALJ's findings "are part of the record we must review" and therefore are considered

"to the extent that they reduce the weight of the evidence supporting the Board's conclusion." *Int'l Union, United Auto., Aerospace & Agric. Workers*, 514 F.3d at 581 (citing *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 879 (6th Cir. 1995)).

III.

As a preliminary matter, the Board argues that two issues raised by the Union are jurisdictionally barred because they were not properly presented to the Board. The first is whether the Board's opinion imposes too great a duty to act on the Union given the established standard for the duty of fair representation (Issue 1). The second is whether the failure to disclose Faircloth's statement is immaterial because the Union cannot breach its duty of fair representation when it had no obligation to pursue an unmeritorious grievance in the first place (Issue 2).[8] The Board alleges that these issues were not "specifically assert[ed] before the Board" in the Union's Answer to the Acting General Counsel's Exceptions, or in a subsequent motion for reconsideration. CA6 R. 30, at 23. The Union objects to the Board's assertion, suggesting that it relies on a "hypertechnical and legally unsound" interpretation of the jurisdictional bar under 29 U.S.C. § 160(e), and that the Board was "adequately apprised" of the issues because they were "sufficiently presented" and "necessarily considered" by the Board. CA6 R. 34, at 15, 19. Because we can resolve the case on appeal without reaching Issue 2, we consider only whether Issue 1, the Union's challenge to the scope of the duty imposed by the Board, is jurisdictionally barred.

We lack jurisdiction to hear any "objection that has not been urged before the Board, its member, agent, or agency" unless "the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 690 (6th Cir. 2006); *NLRB v. U.S. Postal Serv.*, 833 F.2d 1195, 1201–02 (6th Cir. 1987) ("Our jurisdiction is conferred by . . . 29 U.S.C. § 160(e)."). We have recognized, however, that "[t]he specificity required for a claim to escape the ban imposed by [§ 160(e)] is that which will 'apprise the Board of an intention to bring up the question.' A general objection

---

[8]The Union conceded that a third issue—whether the Board needed to find that the alleged breach more than likely affected the outcome of the grievance procedure in order to impose liability—is more properly litigated at the compliance stage of the Board's enforcement proceedings.

combined with special circumstances may be sufficient to constitute notice." *NLRB v. Watson-Rummell Elec. Co.*, 815 F.2d 29, 31 (6th Cir. 1987) (internal citation omitted) (quoting *May Dep't Stores v. NLRB*, 326 U.S. 376, 386 n.5 (1945)). An objection was "urged before the board" if it was raised with sufficient specificity in briefing prior to the Board's decision, or in a subsequent motion for reconsideration. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982) (finding an issue barred because it was "not raised during the proceedings before the Board" or "in a petition for reconsideration or rehearing"); *Temp-Masters*, 460 F.3d at 690; *U.S. Postal Serv.*, 833 F.2d at 1202 (recognizing that briefing on exceptions before the Board would be sufficient to preserve an issue).

The Union filed an Answering Brief in response to the Acting General Counsel's exceptions to the ALJ's decision. It does not appear that the Union filed any subsequent briefing before the Board or a motion to reconsider the Board's decision. A review of the record clearly indicates that the Union sufficiently presented arguments about the increased scope of the duty of fair representation similar to those it now raises. In its brief, the Union discussed its duty to "serve the interests of all members" and "avoid arbitrary conduct" as required by *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). JA 1117. It raised an argument that the Board should leave some discretion to the Union in pursuing grievances and that not every grievance would be handled with the "maximum skill and adeptness," nor must "a grievant's case be advocated in a perfect manner." JA 1117–18. The Union asserted that "[m]ere negligence, poor judgment or ineptitude in grievance handling are insufficient to establish a breach of the duty of fair representation." JA 1118. The Union now makes an almost identical argument: "[T]he Board's theory in this case imposes a duty on Unions to act as professional legal ethicists, a duty incompatible with and contrary to established duty of representation law." CA6 R. 21, at 38. Because the Union's prior briefing was sufficient to apprise the Board of the issue it now raises on appeal, we find that Issue 1 was properly preserved for consideration here.

IV.

Before determining whether the Union breached its duty of fair representation to Powell, we address whether there is substantial evidence in the record to support the factual findings relied on by the Board. *See Galicks*, 671 F.3d at 607. Substantial evidence exists if a

"reasonable mind might accept [the evidence] as adequate to support a conclusion." *Int'l Union, United Auto., Aerospace & Agric. Workers of Am.*, 514 F.3d at 580.

A.

There is no question that Faircloth submitted a statement against Powell with respect to the May 11 incident in the cage area. The parties, however, dispute the Board's finding that Faircloth's statement was "partly false." *See* JA 1155. The underlying factual issue is whether Faircloth witnessed the incident between Powell and Tanner. Both the ALJ and the Board determined that Faircloth had not witnessed the incident. After reviewing both the Board's analysis and the administrative record, we conclude that this finding lacks substantial evidence.

Initially, the ALJ determined that "Faircloth was not present in the room at the time [of the threat]." JA 966. The Board agreed, stating:

> In her witness statement, Faircloth asserted that she had witnessed the threat. Consistent with the judge's credibility determinations, which we have adopted, that was not the case. Instead, Faircloth learned of the threat when Tanner reported it to Faircloth immediately following the incident.

JA 1153. The ALJ credited the following testimony of Nathaniel Hudson, a Caravan Knight employee, in making this determination:

> Q. Who is your steward?
> A. Margaret [Faircloth]
> Q. . . . Prior to the meeting that morning – well, the time you were there, did you see Faircloth in the area?
> A. I saw her on my way out.
> Q. She was entering as you were leaving?
> A. Yes.

Hudson Hr'g Tr., JA 669–70. The ALJ also credited testimony from LeVaughn Davis confirming that Hudson was in fact present at the meeting:

> Q. On May 11, 2012, did you attend the daily meeting?
> A. Yes, I did.
> Q. Do you recall who was there?
> A. There was Aretha, Balinda, Ms. Jackie, Debbie, Larry, Eddie, Patrice, Dishan, Amer, myself, *Nathaniel*, Shantell, and Keenan.

Davis Hr'g Tr., JA 890–91 (emphasis added).  Although not mentioned by the ALJ or the Board, Hudson continued his testimony with respect to the incident and Faircloth's presence on cross-examination:

> Q.      . . . [I]s it fair to say that once you left the cage area, you don't know what occurred in the cage area?
> A.      No.
> Q.      Am I correct?
> A.      Yes, you're correct.
> Q.      All right.  And as you were walking out the cage area, you passed Ms. Faircloth, who was entering the cage area?
> A.      Yes.
> Q.      Did you pass her like in the hallway or in the doorway?
> A.      Doorway.  It's a big open space, you know.
> Q.      Okay.
> A.      -- that open up because sometimes we bring supplies in.  She was walking in as I was walking out.
> Q.      All right.  Was she already in the cage area?
> A.      She was just –
> Q.      At the time?
> A.      -- she was just at the entrance.

Hudson Hr'g Tr., JA 679–80.  Hudson also testified that shortly after he left, there was a "commotion" in the cage area, and he saw Powell leave "upset about something."  JA 680.

The Union argues that we need not discredit Hudson to find a lack of substantial evidence because "Hudson's testimony is not inconsistent with Faircloth's presence in the area where the threat occurred."  CA6 R. 21, at 20.  We agree.  Hudson's testimony supports two inferences: first, that Hudson was not present for Powell's threat because he had left the cage area just before it occurred, and second, that Faircloth had entered the cage area just prior to a commotion that left Powell upset, activity that could have been Powell's exchange with Tanner.  There is nothing in Hudson's testimony, however, to support the Board's inference that Faircloth was not present at the time of the threat.  Furthermore, his testimony does not contradict Tanner's testimony that Faircloth was present during the May 11 incident.  Tanner was credited by the ALJ in other parts of the initial decision, but ignored by the Board in considering Faircloth's presence.

Although the record before us does not conclusively establish Faircloth's presence at the time of the threat, we are not faced with a case involving "two equally plausible and reasonable

inferences from the facts." *Exum*, 546 F.3d at 724. The Board's inference as to Faircloth not being present was unreasonable. Such a conclusion is not supportable in a reasonable mind. *See Int'l Union, United Auto., Aerospace & Agric. Workers of Am.*, 514 F.3d at 580. The record further indicates that the Board ignored relevant evidence—Tanner's testimony—that detracted from its findings. *See GGNSC Springfield*, 721 F.3d at 407. The only reasonable inference from the record before the Board was that Faircloth was in the area shortly before the incident between Powell and Tanner occurred. This directly contradicts the Board's finding that Faircloth was not present, which was the basis for finding that her statement was partly false. As such, the Board's finding about Faircloth's statement is not supported by substantial evidence.

B.

Although the Board erred in finding that Faircloth's statement was partly false, our review of the record confirms that there is substantial evidence to find that Faircloth represented Powell in Step 1 of the grievance process. In her role as a union steward, Faircloth prepared and submitted materials that initiated the grievance process after Powell was terminated. She then met with Walle to submit the grievance. Although this was the extent of her formal involvement with Powell's grievance, we find it is sufficient to support the Board's finding that Faircloth had "represented" Powell during Step 1 of the grievance process.

The Union, for the most part, does not dispute the facts in the record.[9] Instead, it argues that the Board "vastly overstates" Faircloth's role in the grievance process, something the Union describes as "ministerial." CA6 R. 21, at 29; CA 6 R. 34, at 9. The fact that there are not significant negotiations during Step 1 and that the majority of grievances are rejected at Step 1 and proceed to Step 2 does not change the fact that Faircloth submitted forms to start the grievance process on Powell's behalf. In doing so, she was representing Powell's interests and ensuring that both Powell and the Union preserved their rights under the CBA to challenge Powell's termination. Powell's testimony supports such a finding regarding Faircloth's role. Powell testified that Faircloth informed her that a grievance had been initiated and that Faircloth would manage the initial steps of the grievance because Powell was not allowed on the premises.

---

[9]The Union vigorously argues that the Board mistakenly found that Faircloth held a "Step 1 meeting" on May 12. But the record clearly states that Powell met with Walle to submit the grievance on May 18.

Powell also testified that she continued to stay in contact with Faircloth about the status of her grievance and alternative avenues for relief. This indicates that Powell understood Faircloth to be an important part of her grievance process and challenges the Union's attempt to minimize Faircloth's role. With this record, we find substantial evidence to support the Board's finding that Faircloth represented Powell in Step 1 of the grievance process.

C.

The Union does not take direct issue with the Board's finding that Powell was unaware that Faircloth had submitted a statement against her throughout her grievance process. The Union concedes that Davis did not mention Faircloth by name during his May 23 call with Powell, in which he shared the company's settlement offer, and advised Powell of statements against her. The Union points out that Powell knew about the statement "at the latest on June 2, only 8 days after her last discussion with Davis about the settlement on May 25." CA6 R. 21, at 34. But the Union does not dispute the Board's finding that neither Faircloth, Davis, nor anyone at Local 1700 disclosed Faircloth's statement prior to the conclusion of the grievance process. Because the Union has effectively admitted that it failed to disclose Faircloth's statement, we uphold the Board's finding. *See Galicks, Inc.*, 671 F.3d at 608 (citing *FiveCap, Inc.*, 294 F.3d at 768).

To the extent that the Board's finding is disputed, there is substantial evidence that the Union failed to disclose Faircloth's statement. Powell testified that she was aware that Tanner had filed a statement against her, but it was only after filing a charge with the Board that she was informed that Faircloth had filed a statement about the incident. The record supports this testimony. Powell filed her first charge with the Board on May 16. Powell did not mention Faircloth's statement until she filed a second charge with the Board in early June, well after Davis settled the grievance with Caravan Knight. These undisputed facts provide substantial evidence for the Board's finding that no one disclosed Faircloth's statement to Powell, and that Powell was unaware of the Faircloth statement while her grievance was being processed.

V.

Having evaluated the Board's factual findings, we consider whether the record provides substantial evidence to support the Board's determination that Local 1700 breached its duty of fair representation to Powell on these facts.**10** *See Galicks, Inc.*, 671 F.3d at 607–08. Although we recognize our policy of deference to the Board's determinations, *see id.*, we conclude that the remaining factual basis of the Board's decision—that Faircloth and Local 1700 failed to disclose Faircloth's adverse statement to Powell while Faircloth was representing her in grievance proceedings—is insufficient to support such a finding. Because there is no basis to find that the Union violated its duty of fair representation on either the facts of this case or any applicable precedent, we see no reason to remand the case to the Board. Instead, we vacate the portion of the Board's decision finding that Local 1700 violated its duty of fair representation

A.

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations" as well as the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Under Section 8(b)(1)(A), it is an unfair labor practice for a labor organization to "restrain or coerce" employees in exercising their Section 7 rights. 29 U.S.C. § 158(b)(1)(A). Within the framework of the NLRA, the Supreme Court has found that unions have an implied duty of fair representation to their members. *Driver v. U.S. Postal Serv.*, 328 F.3d 863, 868 (6th Cir. 2003) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)). This duty "stands 'as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.'" *DelCostello*, 462 U.S. at 164 n.14 (quoting *Vaca v. Sipes*, 386 U.S. 171, 182 (1967)). It applies "in all contexts of union activity, including contract negotiation, administration, enforcement, and grievance processing." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (citing *Williams v. Molpus*, 171 F.3d 360, 364–65 (6th Cir. 1999)).

---

**10**We recognize that we could consider the Board's determination of the scope of the duty of fair representation as a matter of law *de novo*. Because the Board's application of law to fact fails under the more deferential "substantial evidence" standard, we apply that here.

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. This standard provides "three separate and distinct possible routes by which a union may be found to have breached its duty." *Driver*, 328 F.3d at 869 (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994)). Because there is no allegation of discrimination here, we consider only whether Local 1700 breached its duty by acting arbitrarily or in bad faith.

B.

"A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Airline Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (internal citation and quotation marks omitted). "The 'wholly irrational' standard is described in terms of 'extreme arbitrariness.'" *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 539 (6th Cir. 2003) (quoting *Black*, 15 F.3d at 585). In the context of employee grievances, we have held that the duty of fair representation requires a union to undertake a "reasonable investigation to defend a member from employer discipline." *Driver*, 328 F.3d at 869 (quoting *Black*, 15 F.3d at 585). It "does not require a union to exhaust every theoretically available procedure simply on the demand of a union member. . . . However, the ignoring or the perfunctory processing of a grievance may violate the duty of fair representation." *St. Clair v. Local 515*, 422 F.2d 128, 130 (6th Cir. 1969) (citing *Vaca*, 386 U.S. at 194). Furthermore, we have held that "[m]ere negligence on the part of a union" is not sufficient to show arbitrary conduct, *Garrison*, 334 F.3d at 538 (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372–73 (1990)), and we note that "when reviewing a union representative's actions or omissions, we must never lose sight of the fact that union agents are not lawyers, and as a general proposition, cannot be held to the same standard as that of licensed professionals," *id.* at 539; *see also Danton v. Brighton Hosp.*, 335 F. App'x 580 (6th Cir. 2009).

The Board did not address in detail how Local 1700's actions constituted arbitrary conduct. The decision cites no judicial or Board precedent to support such a finding. Instead, it simply asserts that Faircloth's representation of Powell without disclosing her adverse statement,

along with the inference that such action "reasonably could have altered Powell's approach to the processing of her grievance," constituted arbitrary conduct sufficient to establish a breach of the duty of fair representation.  JA 1155.  After reviewing the record, we agree with the Union that there is not substantial evidence to find that Local 1700 acted arbitrarily with respect to Powell because Local 1700's actions were not "wholly irrational."  *Garrison*, 334 F.3d at 539.

First, there was a rational basis for Local 1700 not to disclose Faircloth's statement.  It was reasonable for Local 1700 to be concerned about how Powell would respond based on her history at Caravan Knight.  Prior to the May 11 incident, Powell had both indicated her desire to fight Faircloth and had an altercation with an ex-boyfriend at the plant.  Faircloth testified that she gave her statement regarding Powell's incident with Tanner only because she believed Powell's behavior to be escalating.  The Board recognized that Faircloth's statement "would in all likelihood result in Powell's discharge," but found it acceptable for Faircloth to submit such a statement because "the union [had] a legitimate interest in reporting such threats to an employer consistent with its duty to represent all unit employees."  JA 1154.  Local 1700's interest in protecting the entire bargaining unit from the threats of a single union member makes it rational to not disclose Faircloth's statement in an attempt to protect her from any retaliation by Powell.

Second, there was a rational explanation for Faircloth's decision to represent Powell during Step 1 of the grievance process.  Powell was unable to file a grievance herself because she was not allowed to be on the Plant's premises.  The responsibility thus fell to Faircloth as Powell's union steward.  Although, in theory, Faircloth could have recused herself, the only evidence in the record to support such a practice was Davis's testimony that he had, on occasion, processed grievances for employees when a union steward was unable to do so.  We hesitate to find that Local 1700 breached its duty of fair representation because Faircloth did not recuse herself.  Such an action starts to resemble a rule similar to an attorney's conflict of interest—and our prior cases clearly state that "union agents are not lawyers" and "cannot be held to the same standard as that of licensed professionals."  *Garrison*, 334 F.3d at 539.

We also note that Faircloth's representation of Powell at Step 1 did not adversely affect the outcome of the grievance proceedings.  The record indicates that Step 1 usually consists of nothing more than a union steward filling out a bare-bones form to notify the employer of the

grievance's basic allegations. This is all Faircloth did at Step 1 in this case. And at Step 2, another union official, Davis, represented Powell and negotiated a settlement on her behalf. The Board found that this settlement was reasonable and consistent with a settlement offered to another employee in a similar case. This leaves no factual basis on which to conclude that Faircloth's involvement at Step 1 affected the outcome of the grievance proceedings in any way.

Furthermore, the Board's own precedent allows a union member and her union representative to have an adverse relationship without the Union breaching its duty of fair representation. *Roadway Express, Inc.*, 355 N.L.R.B. 197, 202 (2010). At most, Faircloth's failure to recuse herself from Powell's grievance process at the outset was negligent. Her actions were not wholly irrational. Thus, there is not sufficient evidence to support the Board's finding that Local 1700 breached its duty of fair representation by engaging in arbitrary conduct.

C.

A union can also breach its duty of fair representation by acting in bad faith. This occurs when "it acts with an improper intent, purpose, or motive . . . encompass[ing] fraud, dishonesty, and other intentionally misleading conduct." *Merritt*, 613 F.3d at 619 (quoting *Spellacy v. Airline Pilots Ass'n Int'l*, 156 F.3d 120, 126 (2d Cir. 1998)). In this case, there is little, if any, evidence in the record to support a finding that Local 1700 acted with improper intent. Had there been substantial evidence to support the claim that Faircloth gave a partly false statement, the Board might have been able to establish bad faith conduct. Faircloth's failure to disclose her statement during her representation of Powell, however, is an insufficient basis to find that she and Local 1700 acted in bad faith. Additionally, the record indicates that Faircloth properly handled the grievance, that the grievance was resolved by Local 1700 on terms favorable to Powell, that the settlement was "reasonable and consistent" with that of an analogous incident, and that there was no evidence that Powell would have accepted the offer at Step 2 if she had had a different representative at Step 1. This is not the type of "intentionally misleading conduct" associated with a finding of bad faith. *Merritt*, 613 F.3d at 619. We conclude that the Board lacked substantial evidence to find a breach of the duty of fair representation on the basis that Local 1700 acted in bad faith.

VI.

For these reasons, we grant the petition for review, deny the cross-application for enforcement, and vacate the portion of the Board's decision finding that Local 1700 violated its duty of fair representation.

---

**CONCURRENCE**

---

STRANCH, Circuit Judge, concurring. I concur with the lead opinion that there is not sufficient evidence to support the Board's finding that Local 1700 breached its duty of fair representation, but write separately to emphasize the unique circumstances that merit vacating the Board's decision. In reviewing the Board's factual determinations under the substantial evidence standard, we defer to the Board's reasonable inferences and credibility determinations even when "we would conclude differently under de novo review." *Mt. Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 844 (6th Cir. 2003) (citing *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir. 2002)). This considerable deference reflects the weight given to the Board's expertise and its prerogative to choose among the conflicting testimony of witnesses. *See NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514 (6th Cir. 1998) ("[I]f the record supports the Board's decision, we may not substitute our own judgment for that of the Board.")

In the present case, the Board expressly stated that it relied on a combination of three factual findings to determine that Local 1700 violated its duty of fair representation. As explained in the lead opinion, we find that one of these conclusions—that Faircloth submitted a partially false statement—is not supported by substantial evidence in the record. Though the Board's other two factual findings remain, they are insufficient to support its ultimate conclusion. The Board's determination rested expressly on the cumulative effect of these three findings. Had the Board's determinations on the three factors been independent, remand to the Board for consideration in light of our reversal on one finding would have been appropriate. On this unusual record, however, I concur with vacating the portion of the Board's decision finding that Local 1700 violated its duty of fair representation.