RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0140P (6th Cir.)
File Name: 03a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES B. DRIVER,
　　　　*Plaintiff-Appellant,*

　　　*v.*

UNITED STATES POSTAL
SERVICE, INC.; AMERICAN
POSTAL WORKERS UNION,
AFL-CIO,
　　　　*Defendants-Appellees.*

No. 01-6079

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 98-00092—William J. Haynes, Jr., District Judge.

Argued: May 1, 2003

Decided and Filed: May 14, 2003

Before: MOORE and ROGERS, Circuit Judges; HOOD,
District Judge.*

---

*　The Honorable Joseph M. Hood, United States District Judge for the
Eastern District of Kentucky, sitting by designation.

---

### COUNSEL

**ARGUED:** Denty Cheatham, CHEATHAM, PALERMO &
GARRETT, Nashville, Tennessee, for Appellant. Van S.
Vincent, ASSISTANT UNITED STATES ATTORNEY,
Nashville, Tennessee, Peter J. Leff, O'DONNELL,
SCHWARTZ & ANDERSON, Washington, D.C., for
Appellees. **ON BRIEF:** Denty Cheatham, CHEATHAM,
PALERMO & GARRETT, Nashville, Tennessee, for
Appellant. Michael L. Roden, ASSISTANT UNITED
STATES ATTORNEY, Nashville, Tennessee, Peter J. Leff,
Susan L. Catler, O'DONNELL, SCHWARTZ &
ANDERSON, Washington, D.C., for Appellees.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. Embroiled in
a long-running feud with one of his co-workers at the U.S.
Postal Service, Plaintiff James "Bill" Driver was eventually
transferred from the post office where he had worked for
approximately fifteen years to another post office some
twenty miles farther from his home. With the transfer came
a loss of seniority, and Driver now sues his union, the
American Postal Workers Union, AFL-CIO, for breaching its
duty of fair representation, and he sues the Postal Service for
violating the Collective Bargaining Agreement. In such a
hybrid action under § 301 of the Labor Management Relations
Act, Driver can prevail only if both the union and the
employer breached their duties. Because we find the Union's
investigation and decision reasonable, we conclude that the
Union fulfilled its duty of fair representation, and we need not
address the employer's actions. We thus **AFFIRM** the
district court's grant of summary judgment to the defendants.

# I. BACKGROUND

Seniority matters for the unionized employees at the United States Postal Service, and Bill Driver had put in twenty-five years. Having started out as a part-time flexible, or "PTF," in 1973, Driver was by 1998 a regular forty-hour-per-week employee. The difference between a PTF and a Regular is important. Although PTFs might have slightly higher hourly pay, they have no guaranteed hours and often work split shifts. PTFs often work holidays and Sundays, without the benefit of the overtime pay that Regulars enjoy for such shifts. Under the employees' collective bargaining agreement, seniority for becoming a Regular depended on how long an employee had been at a particular post office; thus Driver's continued tenure at the office in Carthage, Tennessee, where he had worked for the last fifteen of his twenty-five years in the Postal Service, was important to him.

Driver's life at the Carthage Post Office had been difficult since Carolyn Gregory — later Carolyn Markham — was hired in 1994. Taken in the light most favorable to Driver, the evidence shows that Carolyn Gregory complained to other employees about Driver's work and demeanor, bothered Driver with phone calls at home and at work, and accused him of sexual harassment and other misconduct. Postal officials found her most serious allegations unsupported. Carolyn's husband also became a problem at the post office, staring at Driver and others for long periods of time, belittling employees, and accusing Driver — falsely, investigators later found — of stealing post office equipment. Driver, for his part, complained to the postmaster about Carolyn's work performance, circulated a petition claiming that work conditions had been "very stressful since the hiring and problems caused by Carolyn Gregory Markham," J.A. at 422, and according to other employees, found other subtle ways to antagonize Carolyn.

The tension was palpable at the Post Office. The postmaster said that he often spent Monday mornings going through the complaints about what had happened between

Gregory and Driver over their weekend shift, and that twenty to twenty-five customers had asked him about the problems. The Manager of Post Office Operations whose territory included the Carthage office received several letters from Carolyn's husband, and concluded that he could have "no idea what was true and what wasn't true. That was the difficulty with the whole situation. Didn't know the truth." J.A. at 649. The postmaster determined that although Driver was "less guilty" than Carolyn Markham, J.A. at 532, "[t]hey probably were both guilty to some extent," J.A. at 511. Similarly, a postal investigator who checked out Carolyn Markham's sexual harassment complaint concluded,

It is very obvious that these two employees do not like each other. Each has sought to adversely affect the other. Driver being the long term employee, knows the 'tricks' and has employed these to his advantage during the past five years. I doubt that a reconciliation is possible. Both are mature individuals who have decided to not get along with each other. Their hostility affects the ability of that office to provide high level customer service. Because of the size of the office, it is impossible to separate them.

J.A. at 690. Driver acknowledged that the investigator's conclusion that the two employees had "sought to adversely affect the other" was at least "possibly" true. J.A. at 405.

Officials at the employees' union were long aware of the difficulties between the two employees. Although James Green, the union steward, declined to classify what he had done as an "investigation," and was unaware of certain details, he made a number of trips to the Carthage Post Office to deal with the matter. Green spoke with the postmaster several times, met with the postmaster in person three or four times in meetings ranging from ten minutes to an hour, and talked to other employees at the office — one of whom told him that the hostilities had so divided the office that she spoke only to Carolyn Markham, and that another clerk spoke only to Driver. The steward was in contact with the Union's State President, who instructed Green to ask Driver and

Carolyn Markham to get along. Green would make that request, only to find that the disagreements started up again a few days later. Green complained, "To me it was he said/she said. Everything that I've heard from Mr. Driver and Miss Markham, from the time that I've known them, was he said/she said." J.A. at 739.

There were limits to Green's investigation, as he saw certain complaints as management's responsibility, not the Union's. For example, although he had spoken with Driver about Mr. Markham's behavior, Green believed the Union could not stop a customer from harassing an employee. Although the Union would process an employee's grievance asking management to enforce the Collective Bargaining Agreement's guarantee of a safe workplace, Green thought the Union could not take action against Mr. Markham itself. When it came to one employee's complaints against another, Green said that the Union would not even file a grievance. Management resolves problems between employees, Green said, so there was no point in filing a Union grievance against another employee or asking the Union to determine whether Driver or Markham was responsible for their troubles.

After more than three full years of Driver's and Markham's fighting, the Postal Service undertook steps to resolve the employee-employee dispute. After a meeting between Driver, Carolyn Markham, and the Manager of Post Office Operations, the postmaster was told to have a zero-tolerance policy for employees harassing each other. The postmaster then called a meeting in December of 1997. Inviting Union Steward James Green and the Union's State President, the postmaster told the Union officials that he was going to start to try to terminate Driver and Markham for the negative and hostile work environment they had created. The postmaster then invited Driver and Markham into the meeting, whereupon the Union President asked the postmaster to give the two workers one last chance, if the two would start over and stop arguing. The postmaster agreed, and Driver and Markham were asked to shake hands. The two refused.

The postmaster thought that Driver's behavior improved after that December meeting, but in March, Driver contacted the postmaster to complain about Carolyn Markham's husband, and Driver asked the Postal Service to take action. Concluding that the conflict had "created a work environment that is totally unfair and is having a very negative impact on the morale and health of the other employees in the office," J.A. at 715, postal officials decided to transfer Driver and Carolyn Markham to other post offices. Transferring Carolyn Markham alone would be insufficient, they reasoned, because leaving Driver at Carthage would still subject him to Markham's husband's continued visits.

The Union appears not to have opposed the transfers. James Green, the Union Steward, who had concluded that Driver's and Markham's dispute had created a hostile work environment for their fellow employees, thought the two were lucky to have been transferred instead of fired. Upon inquiry by Driver's lawyer, the Union stated that it had "agreed to the transfer of both these employees . . . in lieu of their discharge," J.A. at 38, although in depositions both management and Union officials stated that they could not point to any specific provision of the Collective Bargaining Agreement that would have authorized Driver's termination. Green also admits that he did not investigate the transfer to determine whether the action was corrective rather than punitive under the Collective Bargaining Agreement.

Driver was unhappy with the long commute the transfer gave him, however, and he filed a Step One grievance with the Union, asking that he be returned to Carthage. The Union processed that grievance, and after it was denied, Green, the Union Steward, contacted the postmaster to find out whether there were any conditions under which Driver could return to the Carthage Post Office. The postmaster told him that there were none, because the office had become so much more pleasant without Driver and Markham. Green then contacted two other Carthage employees, one of whom described Carthage as "a nice place to come to work now." J.A. at 795-96.

On May 23, 1998, the transfers were made permanent, and under the Collective Bargaining Agreement the transfer stripped Driver both of his seniority at the new location and the perks that came with that long tenure. On July 9, 1998, Driver's attorney urged the Union to appeal the denial of the Step One grievance, a step that could be taken only by the Union and only within ten days of the denial. When the Union refused, Driver brought this § 301 action under the Labor Management Relations Act in a complaint filed November 4, 1999. Alleging that the Union had breached its duty of fair representation and that the Postal Service had violated the Collective Bargaining Agreement, Driver claims that the Union processed his grievance inadequately by refusing to take his grievance beyond Step One of the grievance procedure. The district court granted the Union's and Postal Service's joint motion for summary judgment, reasoning that even if the Union did agree to Driver's transfer, such a decision could hardly be unreasonable given the co-workers' relationship. Driver now appeals, and we review the district court's decision granting summary judgment de novo. *Gen. Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1097 (6th Cir. 1994). We view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *See id.* at 1097-98.

## II. ANALYSIS

An exception to the general rule that an employee may sue his or her employer for a violation of a collective bargaining agreement only after exhausting any contractual remedies, a hybrid § 301 action permits an employee to sue both the union and the employer. The general rule requiring an employee to proceed through the collective bargaining agreement's grievance or arbitration procedures "works an unacceptable injustice" when the employee's union acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion so as to deprive the employee of the promised fair representation. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983). If a union were able to thwart an employee's rightful cause of action simply by refusing, for

example, to process a grievance, Congress's conferring upon employers and unions of the power to establish exclusive grievance procedures would result in inadequate protection of employees. *Vaca v. Sipes*, 386 U.S. 171, 186 (1967). Accordingly, the hybrid § 301 action enables an employee to sue both his or her union and employer.

The suit consists of two distinct causes of action, one against the employer for violating the collective bargaining agreement under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and one against the union for breaching its implied duty of fair representation under the National Labor Relations Act. *DelCostello*, 462 U.S. at 164. Because an employer's violation of the collective bargaining agreement is ordinarily only enforceable by the union, however, the employee can prevail in either suit only by prevailing in both; the employee must show both that the employer violated the collective bargaining agreement and that the union breached its duty of fair representation. *Id.* at 164-65; *accord Roeder v. American Postal Workers Union*, 180 F.3d 733, 737 (6th Cir. 1999).

Driver alleges that the Union breached its duty of fair representation when it did not pursue the grievance protesting his temporary transfer to the White House Post Office beyond Step One and failed to negotiate for a transfer more favorable to Driver's interests. A union's duty of fair representation derives from the union's status as the employees' exclusive bargaining representative, for "the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf." *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 202 (1944). The Supreme Court defined this duty in *Vaca v. Sipes* to mean that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. This test applies to all union activity, *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991), and describes "three separate and distinct possible routes by which a union may be found to

have breached its duty," *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994).

The duty of fair representation does not require that a union fully pursue every grievance filed. The bargaining structure that Congress created with the National Labor Relations Act and the Labor Management Relations Act recognizes that collective bargaining agreements will often give unions latitude in determining how to handle disputes between employees and the employer. An agreement that lets the union decide when to appeal the denial of an employee's grievance, such as the agreement here, protects the grievance procedure by giving the employer some confidence that grievance procedures will not be overused. *See Vaca*, 386 U.S. at 191-92 ("If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined."). Further, there is no "substantial danger to the interests of the individual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration." *Id.* at 192. Accordingly, a union's decision not to pursue a grievance, based on thorough investigation of the employee's complaint and a reasonable conclusion that the complaint does not merit further use of the grievance procedure, does not necessarily violate the union's duty of fair representation. *See Williams v. Molpus*, 171 F.3d 360, 366-67 (6th Cir. 1999) ("[A] union does not have to process a grievance that it deems lacks merit, as long as it makes that determination in good faith.").

The duty does require that a union investigate the complaint and handle the employee's grievance fairly. Although the union is to be given some deference in its handling of such matters, as its actions are not to be considered arbitrary unless its actions are "so far outside a wide range of reasonableness as to be irrational," *Air Line Pilots*, 499 U.S. at 67 (quotation removed), the union has a duty to conduct an independent investigation of the matter. A union may not, for example, refuse to telephone a witness who the employee specifically

indicated could substantiate his version of the facts and whose testimony probably would have brought about a different decision, *see Black*, 15 F.3d at 578, 585, or give up on an employee's grievance solely because the employer's evidence indicates that the employee was at fault for an incident, *see Schoonover v. Consol. Freightways Corp. of Del.*, 147 F.3d 492, 495-96 (6th Cir. 1998), *cert. denied*, 525 U.S. 1139 (1999). Similarly, when a union believes that a grievance has merit, it may not refuse to appeal simply because the employer maintained that its action was permissible under the collective bargaining agreement. *See Linton v. United Parcel Serv.*, 15 F.3d 1365, 1371-72 (6th Cir. 1994).

Although the Union here ultimately chose to remain neutral as between Driver and Carolyn Markham, it did so only after undertaking the necessary "reasonable investigation to defend a member from employer discipline." *Black*, 15 F.3d at 585. James Green, the Union Steward, had kept himself apprised of the dispute on an ongoing basis. Green made several trips to the Carthage Post Office to deal with their disagreements, and he spoke with the postmaster "several" times, in the postmaster's words, and perhaps as many as twenty-five. This was in addition to the more than fifty times he spoke to each of the two employees themselves about their battle. Although Driver suggests that all of this investigation took place before he had filed his grievance, the evidence shows that, at least when Green was determining whether to appeal the postmaster's refusal to let Driver return to Carthage, Green spoke with other Carthage employees about the decision to transfer Driver and Markham.

In declining to appeal the denial of Driver's grievance, the Union appears to have acted with sufficient information. Although Driver seems to suggest that the Union's investigation was inadequate because it concluded that the situation was "he said/she said," J.A. at 739, and not that Carolyn Markham was truly at fault, the investigation and the resulting conclusion were not arbitrary, discriminatory, or in bad faith. Thus when the Union decided not to appeal the denial of Driver's grievance from the temporary transfer,

because Green "thought . . . a transfer was the best thing for [Driver] and Mrs. Markham, both," J.A. at 753, it was acting not as a representative that agreed with the employee's complaint but simply gave up after one try, *see Linton*, 15 F.3d at 1370, but as a representative that made a good faith determination that the employer's decision was appropriate, *see Whitten v. Anchor Motor Freight, Inc.*, 521 F.2d 1335, 1340-41 (6th Cir. 1975), *cert. denied*, 425 U.S. 981 (1976). There was no evidence that the Union treated Driver's grievance any differently than any other, which would raise questions of discrimination. *See Williams*, 171 F.3d at 367 (finding union to have acted arbitrarily when it discriminated between employees to favor a union official's son); *Linton*, 15 F.3d at 1372 ("[T]here is evidence that the union had never refused to prosecute an appeal on behalf of an employee in Linton's position."). The Union's duty is not merely to Driver or to Markham, but to "all whom it represents," and some union decisions will affect different employees differently. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). Here, even if the Union were wrong that the two were lucky not to have been fired, because there may not have been just cause for termination, it acted reasonably in its conclusion that the employees as a whole were better off after the transfer. It is also uncontested that transferring Driver back to Carthage would leave him subject to additional visits from Bill Markham, whose behavior had prompted many of Driver's complaints. Thus the Union did not act so irrationally as to breach its duty of fair representation.

Because Driver can prevail on his hybrid § 301 suit only if he prevails on both his claim against the union and his claim against the employer, we need not address his claim against the employer. Because the Union's refusal to appeal the denial of Driver's grievance was based on its reasonable and informed conclusion that the grievance should not be pursued, it did not breach its duty of fair representation, and we **AFFIRM** the district court.