NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0450n.06

No. 24-1882

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

THOMAS SCHRAMM,

      Plaintiff-Appellant,

v.

NEENAH PAPER MICHIGAN, INC.,

      Defendant,

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, aka United Steel Workers, aka USW,

      Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Oct 06, 2025

KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: SUTTON, Chief Judge; STRANCH and RITZ, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Thomas Schramm filed suit against his Union, United Steelworkers International, asserting breach of the duty of fair representation arising out of the Union's refusal to grieve his second termination. The district court granted summary judgment on the ground that Schramm failed to adduce sufficient evidence of a breach. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.   BACKGROUND

### A.   Factual Background

Since 1986, Schramm worked for Neenah Paper Company, a producer of paper-based consumer products, at the company's plant in Munising, Michigan. As of 2021, Schramm was the

plant's Fire Chief and a member of the United Steelworkers Union, District 2, Local 2-96, which represents the plant's maintenance workers. United Steelworkers International (USW) negotiated a collective bargaining agreement (CBA) with Neenah on behalf of Local 2-96 along with a separate USW union, Local 2-87, which represents the production employees at the Munising plant.

### 1. Schramm's First Termination

This case involves two claims of unjust termination, separated by time, which Schramm sought to grieve. Neenah first terminated Schramm on March 1, 2021, for reporting a chemical spill to the Michigan Department of Environment, Great Lakes, and Energy, purportedly in violation of Neenah's confidentiality policies. Schramm contested the termination, thereby triggering the CBA's grievance process.

The CBA establishes a grievance procedure consisting of three stages. Under standard protocol, Local 2-96 is the entity that is generally responsible for filing grievances on behalf of its members and shepherding those grievances through the first two stages. At the first stage, the local union steward presents the grievance to the employee's supervisor. If the grievance is not resolved, the local union steward transmits the grievance up the chain of command to the department superintendent or a designated representative. If no resolution is reached, the grievance proceeds to the third stage. At that point, an international representative from USW takes over and attempts to negotiate a settlement with the plant manager. If no agreement is reached, the matter may proceed to arbitration. At the time of Schramm's termination, Chris Haddock was the USW staff representative in charge of overseeing and prosecuting member grievances beginning at the third stage.

Local 2-96 filed a grievance on Schramm's behalf and represented him through the first two stages, both of which resulted in denials and led to Haddock taking over the grievance procedure at the third stage. During the third stage, Schramm filed suit in federal court, alleging violation of the Whistleblower Protection Act, and the parties agreed to stay the litigation pending arbitration. On October 6, 2021, before arbitration occurred, Neenah agreed to reinstate Schramm with backpay. Neenah continued to negotiate with the USW and Schramm, represented by Haddock, on the amount of backpay and other "additional rules that might exist" regarding Schramm's return to work. R. 77-2, Schramm Dep., PageID 1315. In December 2021, Neenah entered into a Settlement Agreement that set Schramm's return-to-work date as January 3, 2022, and Schramm's lawsuit was dismissed by stipulation.

### 2. Tensions Between Schramm and Other Neenah Employees

Schramm had a contentious relationship with a number of employees at Neenah. Relevant here, in May 2021, shortly after his first termination, Schramm told Josh Trader, the president of Local 2-96, that he wanted to see five Neenah employees fired. These employees included Kathy Hill, Neenah's local human resources director, and Brian Houghton, the manager of the Munising plant.

Schramm's apparent animus toward his coworkers became an issue of concern among officials at Neenah, as well as the local unions. According to Trader, during reinstatement negotiations for Schramm, multiple Neenah employees voiced concerns that Schramm had a "hit list" consisting of the five Neenah employees that he wanted fired and that Schramm was "volatile," "hostile," and potentially "violent." R. 77-10, Trader Dep., PageID 1577, 1582-83. Michael Peters, president of Local 2-87, and Gregg Murk, who succeeded Schramm as Fire Chief after Schramm's first termination, testified that they heard similar expressions of concern from

Neenah employees regarding Schramm's behavior and his list, though neither recalled it being expressly referred to as a "hit list." Trader, Peters, and Murk passed these concerns on to Haddock, as the individual who oversaw the third stage of Schramm's grievance and the negotiations over his return to work. They did not, however, provide Haddock with the names of the individuals who purportedly felt threatened, citing the individuals' fear over potential "repercussions from . . . Schramm." R. 77-4, Haddock Dep., PageID 1374.

During this period, officials at Local 2-96 and Local 2-87 internally voiced their concerns about Schramm's prospective return to work. For example, on October 10, 2021, Trader texted Murk that he was "embarrassed to be representing [Schramm]." R. 78-14, Trader/Murk Texts, PageID 1666. In response, Murk texted that "[Schramm's] going to be a f-----g pain" and mused that "[m]aybe Haddock will piss [Schramm] off enough he will just go away." *Id.* at PageID 1667. On November 3, Trader emailed Hill that he "still believe[s] it would be beneficial to find a way to not have [Schramm] back." R. 79-1, Trader/Hill Email, PageID 1681. Five days later, on November 8, Trader informed Hill that Schramm had called him multiple times and left multiple voicemails, and he called Schramm "nuts." R. 79-2, Trader/Hill Texts, PageID 1683.

Hill testified that she became increasingly concerned about her safety as Fall 2021 wore on. On October 13, Hill emailed Monica Howe, Neenah's vice president of human resources, reporting information from Peters and Trader that Schramm was "going around telling people he's going to [get]" her and multiple other colleagues "fired when he gets back" to work. R. 77-5, Hill Dep., PageID 1436. On November 17, while he was out of state, Schramm texted Trader and Murk asking if Hill was in the office. According to Schramm, he wanted to speak with Hill about backpay and insurance issues. Trader and Murk reported the texts to Hill, voicing concerns for her safety. Hill reported the safety concerns to Howe and Houghton. In a November 18 email to

Howe, Hill wrote that she had shared her concerns about Schramm with Haddock and emphasized that she "would be doing everything in [her] power to stop this madness," and that Haddock was "very supportive and said [she] had to do what was right for [her] and the Munising employees." R. 79-5, Hill/Howe Email, PageID 1692. Howe passed these concerns on to Neenah's corporate management.

### 3. Schramm's Second Termination

On December 21, 2021, Howe and two members of Neenah's corporate team—Michael Rickheim and Noah Benz—decided to terminate Schramm's employment. That same day, Howe drafted a list of talking points that would be provided to Schramm regarding his termination. The document, titled "Communication Plan," explained that Schramm was being terminated because of "comments and behaviors" that "violat[ed]" Neenah's "workplace harassment and appropriate behavior policy." R. 79-6, Communication Plan, PageID 1696. The Plan cited Schramm's "[e]xcessive phone calls or text messages" and repeated "reference[s]" to "a hit list with [five] names on it," and it stated that Schramm's fellow employees were afraid of him and were "looking for places to hide" should he return to work. *Id.* Howe spoke with Haddock regarding the decision and emailed him a copy of the document. Howe testified that Haddock "supported the company's decision when [she] called him and told him." R. 77-7, Howe Dep., PageID 1498.

On December 28, Howe held a conference call with Schramm and Haddock, in which she informed Schramm that he was being terminated from Neenah due to his inappropriate behavior. Haddock asked "what proof" Howe possessed that Schramm had behaved inappropriately. Howe pointed to "excessive phone calls and text messages" from Schramm, as well as "multiple comments and threats" that he had made regarding a "hit list" of his fellow employees. *Id.* Haddock stated that the termination was "out of the blue" for him and that he would need to "put

together an information request seeking out th[e] individuals" who voiced safety concerns regarding Schramm. *Id.* at PageID 1847-49. Haddock also told Howe that he would have to grieve the termination.[1]

During the call, Schramm confirmed that he had been angry with Hill and four other Neenah employees, though he denied that he had a "hit list" and asserted that he had initially planned, upon his return to work, to make amends with these five individuals. He continued to criticize these individuals on the call, accusing them of fostering a hostile work environment and falsifying information relating to the first termination. Schramm also asserted that Hill was "the one that started" the conflict between him and Neenah, and he acknowledged that Hill was scared to work with him. R. 84-2, Call Tr., PageID 1852, 1857. At the end of the call with Howe, Schramm began to say, "the day that I come back to work that's the day that . . ." before trailing off and stating, "you know what, I'm going to let Chris deal with it because Chris knows what's in the wind when I come back to work for [K]athy Hill." *Id.* at PageID 1857-58. Haddock immediately ended the call with Howe.

Haddock then called Schramm back and told him that his statement that Hill "knows what's in the wind" constituted a "threat" that "did not help" their case "at all" and "probably cut [their] feet right off." *Id.* at PageID 1858-59. Schramm denied that he meant the comment as a threat and posited that "the thing that's in the wind with [K]athy Hill" is "the grievance." *Id.* at PageID 1861. Schramm also emphasized that the accusations against him were "complete bulls- - t," to which Haddock responded, "I hope you're right." *Id.* at PageID 1859. Haddock expressed doubt that Neenah would "give [him] the names of the people" who complained about

---

[1] The transcript of the call erroneously transcribes the word "grieve" as "read."

Schramm "if the people are feeling threatened." *Id.* He stated, however, that he would "file a grievance and an information request" on Schramm's behalf. *Id.*

Haddock alerted Trader that he would handle the grievance for this second termination. On December 31, Schramm received his termination letter, which he forwarded to Haddock that same day. Per the CBA, Haddock had two days to file the grievance, excluding weekends and holidays, thus placing the filing deadline on January 4, 2022. On January 3, Haddock emailed Howe a request for information and to extend the grievance deadline, both of which Howe denied on January 5, one day after the deadline's passage. Haddock then sent Schramm and Howe a letter informing them that USW would not be pursuing a grievance in response to the second termination.

Haddock testified that his decision not to file a grievance on Schramm's behalf was based on three factors: (1) he found credible Howe's assertions that Schramm had engaged in threatening behavior; (2) Schramm admitted that he had a list of five Neenah employees "who were the objects of his anger"; and (3) Haddock believed Schramm's "in the wind" comment was a veiled threat against Hill. R. 75-1, Haddock Decl., PageID 1182-83.

**B.     Procedural History**

On March 2, 2022, Schramm filed suit against Neenah. Schramm added USW as a party to the action on June 28. On March 8, 2023, Schramm filed his second and final Amended Complaint against Neenah and USW, asserting claims against Neenah and one count of breach of the duty of fair representation (DFR), brought pursuant to Section 301 of the Labor Management Relations Act (LMRA), against USW. Schramm and Neenah then reached a settlement agreement, leaving USW as the sole remaining defendant.

Schramm and Neenah cross-moved for summary judgment on March 29, 2024. On September 11, the district court granted USW's motion for summary judgment and denied Schramm's motion for summary judgment. Schramm timely appealed.

## II. ANALYSIS

The district court had federal question jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction to hear the timely appeal under 28 U.S.C. § 1291.

We review a district court's order granting summary judgment de novo. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559 (6th Cir. 2022). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). We view the facts in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020).

Schramm brings a "hybrid" action under § 301 of the LMRA, 29 U.S.C. § 185 consisting of two claims: (1) breach of a collective bargaining agreement by the employer and (2) breach of the duty of fair representation by the union. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003). The two claims are inextricably linked; the plaintiff cannot succeed in the action unless he establishes both claims. *Id.* Here, however, the district court ruled only on the DFR prong, and because that prong is dispositive, it is the focus of this appeal.

To demonstrate a violation of the DFR, a plaintiff must show (1) that the duty applies, (2) that the union breached the duty, and (3) that the breach caused the plaintiff's injury. *See Vencl v. Int'l Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 426 (6th Cir. 1998); *accord James v. Norfolk S. Ry. Co.*, No. 24-3275, 2025 WL 2049553, at *8 (6th Cir. July 22, 2025) (same). The

parties agree that the duty applies, and do not contest or discuss the issue of causation. Accordingly, we focus exclusively on breach, which is the dispositive issue on appeal.

A union is not obligated to file or prosecute grievances that it deems meritless. *Williams v. Molpus*, 171 F.3d 360, 366-67 (6th Cir. 1999), *overruled on other grounds, Chapman v. United Auto Workers Loc. 1005*, 670 F.3d 677 (6th Cir. 2012). A union must, however, "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). Accordingly, a "breach of the duty of fair representation occurs" when "a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010). To prove a breach of the DFR, a plaintiff must show arbitrariness, discrimination, or bad faith—he need not demonstrate all three to succeed. *Id.* Here, Schramm asserts that USW acted arbitrarily and in bad faith when it failed to grieve his second termination.

### A.     Vicarious Liability

Before evaluating Schramm's claims, we address a threshold issue—whether USW can be held vicariously liable for the conduct of officials of its local unions. Notably, Schramm has sued only USW, and not the two local unions. The parties agree that, although the decision over whether to file a grievance generally falls to the local union, Haddock assumed responsibility over that decision on behalf of USW.

In his reply brief, Schramm argues—for the first time on appeal—that USW and its non-defendant local affiliates should not be treated as distinct legal entities, and that USW can be held liable for the conduct of officials of its local affiliates. But Schramm's principal brief lacks any argument regarding vicarious liability. Its theories of arbitrariness and bad faith are tied solely to

Haddock's conduct. Schramm's failure to raise the issue waives this theory of liability. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("[A]rguments made to [this court] for the first time in a reply brief are waived.").

We therefore turn to Schramm's claims, evaluating whether USW breached its DFR based on Haddock's decision making and conduct.

### B. Arbitrariness

A union "breach[es] the duty of fair representation under the 'arbitrary prong'" only "if the union's conduct can fairly be characterized as 'so far outside a wide range of reasonableness' that it is 'wholly irrational.'" *Merritt*, 613 F.3d at 619 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991)). A union's conduct is irrational if it is "without a rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998). This deferential standard "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Id.* at 45–46.

Schramm argues that USW acted arbitrarily because it failed to conduct an adequate investigation into the allegations against him and, as a result, made an ill-informed and unreasonable decision. A union "must undertake reasonable investigation to defend a member from employer discipline." *Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992). This investigation must be "independent," and the union may not, for example, "give up on an employee's grievance solely because the employer's evidence indicates that the employee was at fault for an incident." *Driver v. U.S. Postal Serv., Inc.*, 328 F.3d 863, 869 (6th Cir. 2003). Nonetheless, the extent to which a union must investigate a particular complaint or issue depends on the surrounding circumstances, and the union's investigatory decisions are entitled to judicial deference. *See Walk*, 958 F.2d at 1326–29. The key question is whether the union acted "with

sufficient information" and made a rational decision based on that information. *Driver*, 328 F.3d at 870; *see Vaca*, 386 U.S. at 194.

The district court concluded that USW did not act arbitrarily, pointing to (1) evidence that officials of both Neenah and the local union raised concerns to Haddock that Schramm was behaving in a threatening manner and causing his coworkers to fear for their safety, and (2) statements made by Schramm on his December 28 termination call with Haddock and Howe.

We turn to the record. As the court correctly recognized, at the time of the December 28 termination call, Haddock had already spoken not only with multiple Neenah officials, including Hill and Howe, but also with members and officials of the local union, including Trader and Peters. All these individuals told Haddock that Schramm was angry with several of his coworkers, and that Schramm's fellow employees at the Munising plant were afraid of him and anxious about his return to work. They also complained of excessive calls and messages from Schramm, including messages asking about Hill's whereabouts, and reported that employees at the plant were looking for places to "hide" should Schramm return to work.

Critically, Schramm validated these concerns during his termination call. Although he denied having a "hit list," Schramm confirmed that he had been angry with Hill and four other Neenah coworkers, continued to criticize those same coworkers, and conceded that Hill was "afraid to work with [him]." R. 84-2, PageID 1852-53, 1856-57. With Howe still on the line, Schramm said "the day that I come back to work that's the day that . . ." before simply concluding that Haddock "knows what's in the wind when I come back to work for [K]athy Hill." *Id.* at PageID 1857-58. Given the context, this statement can reasonably be interpreted as a threat against Hill. Schramm had just expressed anger toward Hill and acknowledged that she is "afraid" of him. *Id.* at PageID 1856-57. The statement also accorded with Neenah's proffered rationale for the

-11-

termination—that Schramm was threatening Neenah employees and making them feel unsafe. Indeed, when the statement was made, Haddock quickly ended the call with Howe, called Schramm back, and told him that he "probably cut our feet right off." *Id.* at PageID 1858.

Based on Schramm's statements on the call with Haddock and Howe, as well as the information Haddock collected from Neenah officials and local union officials, it was not "wholly irrational" for Haddock to conclude that Schramm would not prevail in his grievance. *Merritt*, 613 F.3d at 619 (quotation omitted). Haddock had a sufficient basis to conclude that Schramm's statements would reasonably be perceived as threatening and would validate Neenah's concerns that Schramm posed a risk to the physical safety of its employees. Because Haddock's decision was adequately informed and rational, it is entitled to judicial deference. *See Marquez*, 525 U.S. at 45-46.

Schramm contends that the district court erred in deeming these bases sufficient to justify USW's decision because the court made impermissible credibility determinations and ignored its responsibility to resolve the facts in the light most favorable to the nonmovant. Specifically, Schramm argues that the district court ignored his explanation that he did not intend to threaten Hill and credited Haddock's testimony that he found the statement threatening. That critique misapprehends the standard. The question for the court is not whether Schramm intended the statement as a threat or even whether Haddock was convinced that Schramm intended to threaten Hill. Rather, it is whether Haddock's decision not to file a grievance was sufficiently informed and rational. *See Driver*, 328 F.3d at 870; *Vaca*, 386 U.S. at 194. Here, viewing the evidence in the light most favorable to Schramm, the record makes clear that Haddock had a reasonable basis, by the grievance filing deadline, to conclude that any grievance filed on Schramm's behalf would lack sufficient merit to proceed to arbitration. Haddock, in sum, acted within the wide range of

discretion afforded to him as a union representative. *See Marquez*, 525 U.S. at 45-46. On this record, we cannot say that the district court erred in finding that Haddock's conduct was not arbitrary.

### C. Bad Faith

Schramm also asserts that USW breached the DFR because it acted in bad faith by failing to grieve his second termination. As evidence of USW's bad faith, Schramm points to Haddock's "inaction" in representing him, as well as purported evidence of dishonest or deceptive conduct, including (1) two instances in which Haddock privately expressed support for Schramm's termination to Neenah officials, and (2) false or misleading statements made by Haddock during the termination call. The district court determined that Haddock did not act in bad faith, reasoning that the record "does not show that Haddock's decision was made for an improper purpose." R. 117, Op. & Order, PageID 2369.

"A union acts in bad faith when it acts with an improper intent, purpose, or motive . . . encompassing fraud, dishonesty, and other intentionally misleading conduct." *Merritt*, 613 F.3d at 619 (citation modified). Unlike with the arbitrariness prong, we do not grant deference to unions when assessing bad faith. *Id.* at 620. Nonetheless, to show bad faith, a plaintiff must adduce "substantial evidence of fraud, deceitful action or dishonest conduct." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 299 (1971) (quoting *Humphrey v. Moore*, 375 U.S. 335, 348 (1964)). Misconduct can include "such gross mistake or inaction as to imply bad faith." *Balowski v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 372 F.2d 829, 833 (6th Cir. 1967). And the misconduct must be tied to some improper intent, purpose, or motive. *Merritt*, 613 F.3d at 619.

Schramm first addresses Haddock's "inaction." Appellant Br. 36. Whether a union's alleged misconduct, including its inaction, constitutes bad faith "depends upon the facts of each case." *See Balowski*, 372 F.2d at 834. Here, as discussed, Schramm has not provided sufficient evidence that Haddock's decision not to proceed further with a grievance was unreasonable or improper under the circumstances of this case. Before the second termination, Haddock spoke with multiple local union and Neenah officials who reported that they were afraid of Schramm because of his threatening behavior. And he heard Schramm, on the termination call, confirm his animus toward a group of employees, including Hill, and make what can reasonably be interpreted as a threat against Hill. Haddock obtained sufficient information to deem Schramm's grievance not meritorious, and his decision not to file a grievance does not suffice to raise an inference of bad faith.

Schramm next points to evidence that Haddock supported his termination, including (1) an email from Hill to Howe saying that upon stating her intention to stop Schramm from reporting to work based on his threats, Haddock "was very supportive and said [she] had to do what was right for [her] and the Munising employees," R. 79-5, Hill/Howe Email, PageID 1692, and (2) testimony from Howe that Haddock "supported the company['s] decision" to terminate Schramm "when [she] called him and told him," R. 77-7, Howe Dep., PageID 1498. This evidence, Schramm argues, indicates that Haddock was "complicit[]" in the plan to terminate him and, therefore, failed to represent him in good faith. Reply Br. 21.

We review this evidence in context and under the bad faith standard. By the time Haddock spoke with Hill, he had already received reports from local union and Neenah officials, including Trader, Peters, and Murk, that Schramm's fellow employees felt unsafe around him. Haddock's conversation with Howe occurred even later, after he heard from Hill that she was anxious about

her physical wellbeing because of Schramm's anger toward her and his requests to find out her physical location. Schramm does not explain how Haddock's alleged support evinces improper intent, purpose, or motive. *See Merritt*, 613 F.3d at 619. Schramm has provided no evidence that Haddock's alleged expression of support was motivated by anything other than the concerns raised by Hill and other individuals regarding their personal safety, which was the basis of his second termination and the issue Haddock was responsible for processing. As the First Circuit has recognized, a union's decision to take an employee's "comments more seriously than he might have wished" is not evidence of bad faith when that union is acting with the purpose of "protect[ing] its [other] members from perceived threats to their safety"—which often requires unions to "balance . . . competing interests." *Alston v. Int'l Ass'n of Firefighters, Loc. 950*, 998 F.3d 11, 27 (1st Cir. 2021). And contrary to Schramm's suggestion, the record evidence does not support the contention that Haddock actively "encouraged a separation" or participated in the decision to terminate Schramm. Appellant Br. 12. Haddock's expression of support, in short, does not meet the criteria for bad faith.

Finally, Schramm points to Haddock's conduct on his December 28 termination call. In response to Howe informing Schramm of his termination, Haddock stated that the termination was "out of the blue" for him and asked "what proof" Howe had to justify the decision to terminate. R. 84-2, Call Tr., PageID 1847-48. As Schramm notes, the record shows that Haddock knew about the termination one week prior and had expressed support. Haddock also told Schramm, immediately after the call with Howe, that he would file a grievance on his behalf, which he did not do. Schramm argues that Haddock's deceptive conduct on the call—when viewed in concert with Haddock's prior knowledge of the termination, expression of support to Hill and Howe, and failure to file a grievance for Schramm—provides sufficient evidence to create a triable issue as to

bad faith. Haddock responds that he was surprised by Howe's decision "not . . . [to] relate the company's specific concerns and allow Schramm to respond," but rather to immediately "beg[in] the [call] by telling Schramm that" he was being terminated. R. 75-1, Haddock Decl., PageID 1176.

Reasonably construing the evidence in the light most favorable to Schramm, we assume for purposes of this appeal, that Haddock was pretending not to have prior knowledge of the termination when he described it as "out of the blue," asked Howe questions to which he already knew the answer, and told Schramm that he would grieve the termination. In *Williams*, we held that the plaintiff had presented sufficient evidence for a jury to conclude that the union acted in bad faith or with discriminatory intent in its handling of the negotiation of a rider to a collective bargaining agreement. 171 F.3d at 367. Among other evidence, the plaintiff there alleged that the union likely secured approval of the agreement through misrepresentations about who ratified the rider and who demanded the rider's endtail provision. *Id.* By contrast, even if Haddock misled Schramm about his prior knowledge of and apparent support for the termination, that conduct— while inappropriate—would not constitute the sort of serious, material misrepresentation that can suffice to raise an inference of bad faith. *See also Alicea v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1st Cir. 1990) (explaining that a misrepresentation must be "serious" and "lack rational justification or [be] improperly motivated" to show bad faith); *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 602 (5th Cir. 2017) (explaining that bad faith requires "sufficiently egregious" union action) (quotation omitted). And, most importantly, Schramm does not point to or identify any improper intent, purpose, or motive underlying Haddock's apparent deception. *See Merritt*, 613 F.3d at 619-20. To the contrary, Schramm argues that Haddock acted out of "irrational fear."

Appellant Br. 36. Fear for the safety of other employees, including other union members at the Munising plant, is not an improper or illegitimate motive. *See Alston*, 998 F.3d at 27.

On this record, we cannot say that Schramm has provided "substantial evidence of fraud, deceitful action or dishonest conduct" evincing improper intent, purpose, or motive. *Lockridge*, 403 U.S. at 299. The district court did not err, therefore, in granting summary judgment to USW on the issue of bad faith. Nor did it err in determining that USW's actions were not arbitrary. Schramm has failed to adduce evidence that USW breached its duty of fair representation.

## III.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.